[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION 
This is an action to dissolve the marriage of the parties on the ground of irretrievable breakdown. Each party was represented by legal counsel. They presented exhibits and testimony on May 8, May 9, May 24, and May 29, 2002.
The more credible evidence leads to the following factual findings. The plaintiff and the defendant, whose maiden name was Deborah Mazzoni, married May 25, 1985, in Cheshire, Connecticut. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There are two minor children issue of the marriage, to wit: Frank Boemmels, Jr., born September 30, 1986, and Brent Boemmels, born September 12, 1989. No other minor children have been born to the wife since the date of the marriage. Neither party nor the CT Page 7779 children have received financial support during the marriage from the State of Connecticut or any municipality thereof. The marriage of the parties has broken down irretrievably.
The plaintiff husband is 49 years old and has a high school education. Since 1978, he has owned and operated a gas station, car wash, and convenience store, known as Boemmel's Auto Wash, Inc. (the gas station), on land located at 490 West Main Street, Cheshire, Connecticut (the business property). After owning and operating the gas station since the 1950's, the plaintiffs parents exercised their option to purchase the business property in 1969. The plaintiff started working at the gas station at the age of seventeen in 1969. He has worked there continuously since 1969. It is the only employment he has ever known. In 1978, the plaintiffs parents gifted the gas station to the plaintiff. Thereafter, he paid monthly rent to his parents for the use of the business property.
The plaintiff's father died in 1995. Shortly thereafter, in 1996, the plaintiffs mother gifted to the plaintiff the business property. Title to the business property is encumbered only by a recent real property tax lien in the amount of $4,350.70. A further lien of like amount will probably be placed on the business property soon because of the plaintiffs inability to pay the installments of the property tax this year. The business property has been appraised at $360,000. However, the appraiser explicitly states that the appraisal assumes no environmental problems at the site. In fact, no mortgage lender has been willing to loan funds to the gas station secured by the business property because of suspected environmental contamination.
In 1977, the Boemmels family knocked down the gas station structure, built a new building, and added the car wash and islands. The plaintiff shepherded the necessary applications through the land use process and acted as general contractor and laborer in the renovation of the gas station. At the time of the parties' marriage in 1985, the gas station was prospering.
In 1992, the Connecticut Department of Environmental Protection required replacement of the gas tanks at the business property. The business was closed for four months for the work. In that same year a new car wash facility was started by a competitor nearby. The gas station has lost a lot of business. In 1999, an Amoco station one mile away remodeled. There is also a Getty station competing within one mile. In April, 2001, the plaintiff was forced by his gasoline supplier to enter into a contract whereby he guarantees to purchase 780,000 gallons per year. Since the gas station sold only 528, 391 gallons in 2001, the gas station fell far short of its purchase requirement. The plaintiff is not sure of the consequences of the shortfall, but expects there to be a CT Page 7780 monetary penalty.
For the past three or four years the gas station has bounced checks on a regular basis. For example, in 2001, the overdraft charges were $4,453. In addition to the current tax lien situation at the business property, the plaintiff recently took out a personal $12,000 note for business cash flow purposes. Because of the recent discovery that the plaintiff has been paying his part-time employees in cash for the past several years, it appears that revised corporate tax returns will be necessary and monies will be owed for employee FICA withholding, worker's compensation, unemployment compensation, interest and penalties.
In order to pay for the gas tank replacements and renovations in 1992, the plaintiff borrowed $180,000 in the form of two notes. The notes, in the amounts of $125,000 and $55,000 are secured by blanket mortgages against the parties' residence at 344 Jinny Hill Road, Cheshire, Connecticut and the house of the plaintiffs mother in Cheshire. Because of a foreclosure action against the parties' residence in October, 2000, and the need for paving at the gas station, the plaintiff borrowed $10,000 from his mother in 2000.
The gas station pays rent of approximately $41,000 per year to the plaintiff for the use of the business property. The gas station pays no salary to the plaintiff, but does pay the expenses of his auto loan, truck maintenance, and gasoline. The plaintiff has no retirement monies. Because the gas station pays rent to him rather than a salary, the plaintiff has not paid into the social security system in recent years. His social security benefit derived from earlier years of employment may be minimal. Despite the gradual death of the gas station, the plaintiff feels that he cannot sell it. He states that it is the only living he knows.
In 1995, the plaintiff began suffering from anxiety, sleeplessness and depression. After trying several depression medications without much success from 1995, to 1998, the plaintiff has been taking medications since 1998, which relieve his symptoms. In 1998, the plaintiff suffered a mild stroke. He was hospitalized for four days. Now he takes one aspirin per day to avert a repetition.
The defendant wife is 45 years old and has a high school education. For twenty-three years she worked for Dalton Contracting as a tennis court line striper. The work was seasonal. For about five months each year she collected unemployment compensation. The children of this marriage were born in September, 1986, and September, 1989. After the older son was born, the defendant stopped working for a couple of years. She then returned part-time until the second son was born. She resumed her CT Page 7781 position as a line striper in the spring of 1990. The defendant's work took her daily to New York, Rhode Island, or various parts of Connecticut. Nevertheless, she arrived home in time to prepare supper and care for the children.
In 1995, the defendant began working in the off season cleaning offices with her friend Bonnie Green two or three evenings a week. That work provided additional family income and continued until the winter of 1999/2000. In 1999, the defendant moved to a sales position within Dalton Contracting, selling tennis court surfacing. Although the work still carries her to the three-state area, it is easier on her back. It is a salaried position paying $39,000 per year. In addition, her employer pays her auto loan, auto insurance, and gasoline expenses. The defendant currently provides health insurance to the entire family through her employment at a cost of $68.27 per week. Like her husband, she has no retirement assets other than a modest social security expectancy. Her health is good.
The children are now 15 and 12 years old. Although the defendant was the primary caretaker when the children were younger, the plaintiff has taken over substantial caretaker responsibilities in recent years. Each party acknowledges that the other is a good parent. The children are in good health and are well adjusted. With the assistance of an attorney appointed to represent the minor children, the parties have developed a parenting plan that is in the best interests of the children.
Each party blames the other for the breakdown of the marriage. The plaintiff asserts that the defendant occasionally stays out until the wee hours of the morning with her own friends. With her friends she frequents bars where live bands are playing. She drinks alcohol to excess and behaves in ways that are embarrassing to the plaintiff, such as dancing on stage. She has refused to have sexual relations with her husband in the past six years. The defendant refused to continue marriage counseling in 1999, after only two sessions.
The defendant claims that the plaintiff has been depressed and non-communicative for the past six years. The defendant feels that the plaintiffs rigid adherence to a fixed visitation schedule early in the marriage for his daughter from a prior marriage inhibited the defendant's contact with her own extended family at holiday times. Although the gas station business is dying, the plaintiff refuses to take positive action to begin a different business or seek alternative employment. The defendant blames the plaintiff for financial stresses on the family. The defendant felt trapped in the marriage for some time, but was reluctant to end the marriage because the children were young and she was financially dependant. For years she was resentful that the running of CT Page 7782 the household and the raising of the children were entirely on her shoulders.
The plaintiff is a soft-spoken man, who does not like confrontation or riotous social events. The defendant communicates easily and is most comfortable amid a crowd of friends in a noisy social situation. When the parties were courting and early in the marriage, they went to bars and danced. They went to concerts. They both consumed alcohol, occasionally to excess. The plaintiff did not really enjoy dancing or rock concerts, but he was aware that his wife loved this activity. The parties also went to car show events about once a week. Classic cars were not an interest of the defendant, but she participated in the social aspects of the shows. The parties bought a boat in 1986. The defendant does not particularly enjoy water activities, but she went along for the ride. The plaintiff likes classic cars, bowling, flying model airplanes, fishing, water-skiing, sightseeing vacations and camping with the boys. The defendant likes cross-stitching, reading, playing softball on her ladies team, dancing, vacations at the beach and partying. Other than the two children and financial interdependence, it is impossible to see what has been keeping these two people together all these years.
By the mid-1990's, the plaintiff was depressed and withdrawn; the defendant was feeling trapped and was desperate to get out of the house for social contact. The court does not blame either party for the cessation of sexual relations between the parties. The fault for the breakdown of the marriage is assessed equally to the parties.
In 1985, the parties purchased the marital residence at 344 Jinny Hill Road, Cheshire (the residence) at a cost of $135,000. The plaintiff sold his 1969 Corvette for $12,000 and contributed another $13,500 from his savings for the down payment. The defendant did not have assets to put toward the down payment on the residence purchase. In November, 2001, the parties stipulated that the market value of the residence was $250,000. The first mortgage on the residence is now $63,500 and the second mortgage is $36,600. Without the third and fourth mortgages that secure the business debt for 1992 renovations (current total $134,500), the equity of the residence would be $149,900 today.
The defendant moved out of the residence April 1, 2002. She now resides in a rented condominium unit at 14 Currier Way, Cheshire. She would like to buy that unit in the future. At this time the defendant's sister, Rose Tammion, pays the defendant's monthly rent of $1,300. Ms. Tammion has also put forward monies to pay the defendant's legal fees and costs for this action. As of this date the total owed by the defendant to her sister in repayment of these loans is $11,300. CT Page 7783
The plaintiff's widowed mother resides in Cheshire in a house valued at $250,000. Since the only lien against her house is the $134,500 owed on the gas station mortgages, sale of her house will probably net $100,000, after closing expenses. The plaintiffs mother plans to sell her house to reside with her son. She is willing to loan to her son funds necessary to pay a property settlement in this dissolution action so that he (and she) can own and reside at the residence at 344 Jinny Hill Road. Cheshire.
The plaintiff and the defendant filed separate income tax returns for the calendar year 2001. The plaintiff claimed both children as exemptions and claimed as deductions all the residence mortgage interest and real estate tax; the defendant claimed one of the children as an exemption and claimed one-half of the mortgage interest and real estate tax as deductions.
The parties held the following assets and debts at the time of the hearing on the dissolution of their marriage:
A. Plaintiffs Assets
1. Boemmel's Auto Wash, Inc. (gas station business) — $31,454
2. 490 West Main Street, Cheshire (business property) — $360,000
3. 1999 Ford pick-up truck — no equity
4. 1963 Chevy Impala — $3,000
5. 1965 Chevy Impala — $10,000
6. 1968 Plymouth Barracuda — $3,000
7. Webster Bank checking account — $60
8. 2 remote-controlled flying model airplanes — no specified value
9. Miscellaneous furnishings
B. Defendant's Assets
1. 1997 Oldsmobile Aurora — $1,200 equity
2. Bank Boston checking account — $50
3. New England Financial whole life insurance policy — $3,930 equity CT Page 7784
4. Collection of Christmas carolers — ca. $500
5. Miscellaneous furnishings, jewelry, china
C. Joint Assets
 1. 344 Jinny Hill Road, Cheshire (residence) — $250,000 less $100,000 1st and 2nd mortgages = $150,000
2. 1988 boat and trailer — $10,000
D. Plaintiff's Debts
1. Fleet Bank card — $230
2. MBNA card — $5,990
3. Capital One card — $600
4. Internal Revenue Service — $2,351
5. Connecticut Commissioner of Revenue Services — $1,488
6. James Greene — $1,100
7. Bill Vogel — $250
8. Eleanor Boemmels — $7,500
9. FS Oil — $457
 10. Gas station business debt to Aldin Associates (1999-2002) — $27,044
 11. Gas station business debts to IRS and Connecticut Commissioner of Revenue Services for unpaid employee benefits — inchoate amount
12. Attorney Robert L. Sweeney, Jr. — 7, 500
E. Defendant's Debts
1. Citibank card — $7,500
2. PNB card — $7.500 CT Page 7785
3. Rose Tammion — $10,000
4. Patricia Santoro — $5,000
F. Joint Debts
1. Attorney Gerald I. Adelman (attorney for minor children) — $1,500
2. 2001 Internal Revenue Service income tax debt — inchoate amount
 3. 3rd and 4th mortgages on 344 Jinny Hill Road, Cheshire — $134,500
The court has considered the criteria of Connecticut General Statutes §§ 46b-56, 46b-62, 46b-81, 46b-82, and 46b-84 in making the following orders:
1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
2. The parties shall have shared legal and physical custody of the two minor children. Each party shall have primary parental care of the children alternating one week at a time. The exchange of the children shall take place after school on Fridays or at noon on Fridays if school is not in session.
3. Primary parental care shall be defined so as to encompass daily decisions normal to parenting a child and maintaining the child's school and activity schedule. It does not preclude the other party from assisting in any parenting or attending any school/sport/family activities that may fall during the time period assigned to the other party.
4. The parties shall confer and agree on all major life issues relating to the children, including but not limited to, school decisions and issues, religion, non-emergency medical issues, and discipline issues so serious that they would extend beyond the seven-day rotation periods. In the event of disagreement as to parenting issues, the parties shall seek assistance of a mutually agreed third party to mediate.
5. Holidays shall be alternated (9 a.m. to 10 p.m..) as follows:
A. Memorial Day — plaintiff in all odd years; defendant in all even years CT Page 7786
 B. 4th of July — defendant in all odd years; plaintiff in all even years
 C. Labor Day — plaintiff in all odd years; defendant in all even years
 D. Thanksgiving Day — defendant in all odd years; plaintiff in all even years
 E. Christmas Eve (4 p.m. to 10 p.m.) — plaintiff in all odd years; defendant in all even years
 F. Christmas Day — defendant in all odd years; plaintiff in all even years
 G. Easter Day — defendant in all odd years; plaintiff in all even years
H. Mother's Day shall always be with the defendant
I. Father's Day shall always be with the plaintiff
J. Other holidays shall follow the usual weekly schedule
6. School breaks shall be allocated as follows:
 A. Christmas week from 9 a.m. December 26 through 10 p. m. the night prior to the start of school shall be with the defendant in all odd years and with the plaintiff in all even years
 B. Winter break (February) from after school on the last day of school through 10 p.m. the night prior to the start of school shall be with the defendant in all odd years and with the plaintiff in all even years
 C. Spring break (April) from after school on the last day of school through 10 p. m. the night prior to the start of school shall be with the plaintiff in all odd years and with the defendant in all even years
 D. If the school removes any one or more school breaks from the calendar, the parties shall share equally the remaining school break times.
7. Summer. Each party shall be entitled to two (2) weeks of summer vacation time with the children. The weeks may be taken consecutively. CT Page 7787 The parties shall exchange proposed schedules as soon as possible each calendar year, but no later than May 15. In the event of a conflict of schedules, the defendant shall prevail in all odd years and the plaintiff in all even years.
8. School break schedules shall supercede the regular schedule. The holiday schedule shall supercede both the school break schedule and the regular weekly calendar.
9. The parties shall not commit the children to any activities that would impinge on the other party's schedule without obtaining prior agreement from the other party.
10.[1] The plaintiff shall pay child support to the defendant weekly in the total amount of $50 during the minority of the children or until the end of secondary school education, whichever is later, but in no event beyond the age of 19 years. This payment deviates from the Guidelines because of the shared custody arrangements. Since the plaintiffs source of income is rents, the wage execution shall be, of necessity, contingent. This child support amount assumes that the parties will contribute approximately equally to the costs of clothing and extracurricular activities for the children.
11. As to any agreed single expense for the benefit of the children in excess of $50, the parties shall each bear half the expense. The parties shall confer in advance of any such expenditure to determine if they are in agreement for the expense. If the parties are not in agreement as to the expenditure, there is no entitlement to reimbursement from the other party.
12. The defendant shall maintain medical and dental insurance for the benefit of the minor children at her own expense as available to her through her employment. If such insurance becomes unavailable to the defendant, the parties shall share equally the cost of a substitute insurance policy for the minor children. The provisions of Connecticut General Statutes § 46b-84 (e) shall apply. The parties shall split equally the cost of unreimbursed medical, dental, optical, orthodontia, psychological, and prescriptive medication expenses for the minor children. This equal split of such unreimbursed costs is in accordance with the child support guidelines.
13. The plaintiff shall maintain his current term life insurance policy in the face amount of $100,000 during the minority of the children and shall name as sole beneficiary the defendant as trustee for the children equally. The defendant shall maintain her current whole life insurance policy in the face amount of $50,000 during the minority of CT Page 7788 the children and shall name as sole beneficiary the plaintiff as trustee for the children equally.
14. Each party shall pay to the other $1 per year alimony so long as the paying party retains any debts now on his or her own financial affidavit.
15. The plaintiff shall retain sole ownership of the Boemmel's Auto Wash, Inc. gas station business and the business property at 490 West Main Street, Cheshire, Connecticut.
16. The plaintiff is awarded the residence at 344 Jinny Hill Road, Cheshire, Connecticut. He shall indemnify and save harmless the defendant as to all costs and expenses relating to that real property, including but not limited to, the four mortgages and the notes underlying those mortgages, the real estate taxes, and any and all liens against that real property. The plaintiff shall be entitled to claim all mortgage interest and real estate property tax payments for the residence for the tax year 2002, as deductions on his income tax returns. The plaintiff shall be responsible at his own expense for preparation of a quitclaim deed to be executed forthwith by the defendant.
17. The plaintiff shall retain sole ownership of the 1999 Ford pick-up truck, the 1963 Chevy Impala, the 1965 Chevy Impala, the 1968 Plymouth Barracuda, the model airplanes, and miscellaneous furnishings. He shall also retain his Webster Bank checking account.
18. The defendant shall transfer to the plaintiff all of the defendant's right, title and interest in and to the 1988 boat and trailer. Transfer documents shall be prepared by the plaintiff for execution by the defendant.
19. The plaintiff shall pay to the defendant by way of lump sum property settlement $90,000 on or before November 30, 2002. Until the payment is made, the defendant shall hold the plaintiffs promissory note and mortgage deed securing the payment as a fifth mortgage against the residence at 344 Jinny Hill Road, Cheshire, Connecticut. The promissory note and mortgage deed shall be prepared by the plaintiff and shall be executed and delivered simultaneously with the delivery by the defendant of the executed quitclaim deed for the residence. If the plaintiff fails to make the lump sum payment on or before November 30, 2002, the residence shall be marketed for sale on December 1, 2002, and sold for the best and most reasonable offer at $250,000 or more.
20. The defendant shall retain her whole life insurance policy with New CT Page 7789 England Financial.
21. The defendant shall retain the 1997 Oldsmobile Aurora and shall save the plaintiff harmless as to all costs and expenses associated with the Aurora. The defendant shall retain her Bank Boston checking account, the collection of Christmas carolers, and miscellaneous furnishings, jewelry and china now in her own possession.
22. The plaintiff shall be solely responsible for any and all shortfalls incurred by the parties or either of them in the payment of taxes to the Internal Revenue Service and the Connecticut Commissioner of Revenue Services arising from the filing of the 2001 income tax returns by both parties. The plaintiff shall indemnify the defendant and save her harmless as to any taxes, interest and penalties determined to be owing taxing authorities for income in the year 2001.
23. Each party shall be solely responsible for all other debts showing on his or her own financial affidavit submitted at the time of the final divorce hearing and shall indemnify and save harmless the other party therefrom.
24. Each party shall be responsible for payment of his or her own legal counsel fees associated with this matter. Each party shall pay $750 to Attorney Gerald I. Adelman in payment for his services representing the children in this matter. Each party on or before November 30, 2002, shall make payment to Attorney Adelman.
25. The plaintiff shall be entitled to claim the minor child Frank, Jr. as a dependant for income tax exemption purposes; the defendant shall be entitled to claim the minor child Brent as a dependant for income tax exemption purposes. When only one child is available to be claimed as a dependant, then the parties shall alternate the claim of the exemption with the plaintiff claiming the child in the first year.
 ___________________ Winslow, J.